**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**WILLIAM J. MCCORKLE,**

**Petitioner,**

**-vs-**                                                     **Case No.  6:06-cv-950-Orl-19UAM**

**UNITED STATES OF AMERICA,**

**Respondent.**

_____

# ORDER

This case comes before the Court on the following:

1.      Petitioner William J. McCorkle's Motion Under Section 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Doc. No. 1, filed July 13, 2006);

2.      Petitioner's Memorandum Of Law In Support Of Motion To Vacate, Set Aside, Or Correct Illegal Sentence By A Person In Federal Custody Filed Pursuant To 28 U.S.C. § 2255 (Doc. No. 4, filed July 21, 2006);

3.      Respondent United States Of America's Response In Opposition To Motion To Vacate, Set Aside, Or Correct Sentence, Pursuant To 28 U.S.C. § 2255 (Doc. No. 18, filed Dec. 22, 2006);

4.      Petitioner's Reply To United States' Response In Opposition (Doc. No. 27, filed Mar. 6, 2007); and

5.      Petitioner's First Notice Of Filing (Supplemental Authority) (Doc. No. 30, filed Sept. 10, 2007).

**Procedural History**

At the conclusion of a jury trial that began on September 1, 1998, Petitioner William J. McCorkle was found guilty on November 4, 1998 of eighty-one (81) counts, consisting of mail fraud, conspiracy to commit mail fraud and wire fraud, money laundering, conspiracy to commit money laundering, conspiracy to commit credit card fraud, and fraudulent use of a social security number. (Crim. Doc. No. 392.)[1] Judgment was entered against Petitioner on January 28, 1999, and he was sentenced to a total term of imprisonment of two hundred ninety-two (292) months. (Crim. Doc. No. 533.)

Petitioner appealed his convictions and sentence to the Eleventh Circuit Court of Appeals. (Crim. Doc. No. 548.) While his appeal was pending, the District Court denied Petitioner's motions for a new trial. (Crim. Doc. No. 972.) Petitioner filed an appeal from this decision also. (Crim. Doc. No. 982.) The Eleventh Circuit ultimately affirmed Petitioner's convictions but vacated his sentence and remanded for resentencing. (Crim. Doc. Nos. 1042, 1049.) After a hearing on resentencing, the Court adopted its previous sentence and on September 12, 2003 ordered that it remain as originally entered. (Crim. Doc. No. 1085 at p. 2.)

Petitioner appealed the Court's decision on resentencing. (Crim. Doc. No. 1089.) While this appeal was pending, Petitioner filed a Section 2255 Motion. (Crim. Doc. No. 117.) This Court denied the Motion without prejudice, and Petitioner filed an appeal from this decision. (Crim. Doc. Nos. 1120, 1129.) The Eleventh Circuit again vacated Petitioner's sentence and remanded for re-

---

[1]    References to filings in Petitioner's criminal trial, case number 6:98-cr-52-Orl-19JGG, will be labeled "Crim. Doc. No." followed by the docket number. References to filings in Petitioner's Section 2255 action, case number 6:06-cv-950-Orl-19UAM, will be labeled "Doc. No." followed by the docket number.

sentencing but denied Petitioner's Section 2255 appeal as moot.  (Crim. Doc. No. 1205.)  On remand, the Court entered Judgment against Petitioner on April 10, 2006 and resentenced him to a total term of imprisonment of two hundred and sixteen (216) months.  (Crim. Doc. No. 1225.)  Petitioner filed an appeal of this decision but ultimately moved to dismiss the appeal, which the Eleventh Circuit granted.  (Crim. Doc. Nos. 1230, 1238.)

Petitioner has now re-filed a Section 2255 Motion and moves the Court to set aside his conviction and sentence and order a new trial.  (Crim. Doc. No. 1239; Doc. No. 1; Doc. No. 4 at p. 30.)  He asserts eight claims for relief: (1) ineffective assistance of trial counsel F. Lee Bailey resulting in *per se* prejudice to his defense at trial; (2) ineffective assistance of trial counsel F. Lee Bailey resulting in actual prejudice to his defense at trial; (3) ineffective assistance of trial counsel F. Lee Bailey creating a lapse in representation during pre-trial, trial, and sentencing; (4) prosecutorial misconduct resulting in a denial of Petitioner's Fifth Amendment right to a fair trial; (5) ineffective assistance of appellate counsel Manuel Hernandez; (6) ineffective assistance of appellate counsel Don West; (7) ineffective assistance of appellate counsel William Kent; and (8) denial of Petitioner's Fifth Amendment right to a fair trial by the District Court.  (Doc. No. 1 at pp. 6-10.)  The United States has filed a Response to this Motion, and Petitioner has filed a Reply to this Response.  (Doc. Nos. 18, 27.)

## Standard of Review

### I.  Relief

Section 2255 provides federal prisoners with an avenue for relief under limited circumstances:

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was imposed in

violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255 (2006).  Thus, a federal prisoner may only obtain relief under Section 2255 if his sentence (a) was imposed in violation of the Constitution or federal laws, (b) was imposed by a court without jurisdiction to do so, (c) was in excess of the maximum permitted by the law, or (d) is otherwise subject to attack.  *Id.*; *see also Boccio v. United States*, Nos. 6:05-cv-179-Orl-19DAB, 6:02-cr-189-Orl-19DAB, 2006 WL 4761060, at *4 (M.D. Fla. Oct. 20, 2006).  If a court finds a claim under Section 2255 to be valid, the court "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."  28 U.S.C. § 2255.  To obtain this relief on collateral review, however, a petitioner must "clear a significantly higher hurdle than would exist on direct appeal."  *United States v. Frady*, 456 U.S. 152, 166 (1982) (rejecting the plain error standard as not sufficiently deferential to a final judgment).

## II.    Hearing

Under Section 2255, unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," then the court shall "grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  The Eleventh Circuit Court of Appeals has explained, "A habeas corpus petitioner is entitled to an evidentiary hearing on his claim 'if he alleges facts which, if proven, would entitle him to relief.'"  *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (quoting *Futch v. Dugger*, 874 F.2d 1483, 1485 (11th Cir.1989)).  However, the Eleventh Circuit continued, "A district court . . . need not conduct an evidentiary hearing if it can be conclusively determined from the record that the

petitioner was not denied effective assistance of counsel." *Id.* at 1154. In other words, "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007); *see also Aron v. United States*, 291 F.3d 708, 715 (11th Cir. 2002) (explaining that no evidentiary hearing is needed when a petitioner's claims are "affirmatively contradicted by the record" or "patently frivolous").

## Analysis

### I.      Timeliness

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that a Section 2255 petition must be filed within one year from the later of several occurrences, including "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(1). As the Eleventh Circuit Court of Appeals recently clarified, "AEDPA's statute of limitations runs from the date the judgment pursuant to which the petitioner is in custody becomes final, which is the date both the conviction *and* the sentence the petitioner is serving become final." *Ferreira v. Sec'y for the Dep't of Corr.*, 494 F.3d 1286, 1288 (11th Cir. 2007).[2]

The Court entered Judgment on remand against Petitioner on April 10, 2006. (Crim. Doc. No. 1225.) The Eleventh Circuit dismissed his appeal of this Judgment on July 10, 2006. (Crim. Doc. No. 1238.) Petitioner filed a Section 2255 Motion on July 13, 2006. (Crim Doc. No. 1239; Doc. No. 1.) This Motion falls well within the one year statute of limitations and is therefore timely.

---

[2]      This case overruled the Eleventh Circuit's previous holding that the statute of limitations began when the judgment of conviction alone was final. *Rainey v. Sec'y for the Dep't of Corr.*, 443 F.3d 1323 (11th Cir. 2006).

## II.      Claims One, Two, and Three

### A.      Applicable Standards

#### 1.      Ineffective Assistance Due to a Personal Conflict

The factual predicate of the first three of Petitioner's claims for relief involves the alleged ineffective assistance of his trial attorney.  Generally, ineffective assistance of counsel claims are governed by the two part test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this test, a defendant must show that: (1) counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense.  *Id.* at 687-88.  To show prejudice, a defendant must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  In other words, "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  Failure to make the required showing of either deficient performance or sufficient prejudice defeats a defendant's ineffectiveness claim. *Id.* at 700.

The Supreme Court has recognized exceptions to the general rule of *Strickland*.  For instance, prejudice has been presumed in extreme cases, such as when a defendant has been denied the assistance of any counsel.  *United States v. Cronic*, 466 U.S. 648, 658-59 (1984).  In addition, unless the trial court determines that no conflict exists, prejudice is presumed when defense counsel is forced to represent co-defendants despite having raised a timely objection. *Holloway v. Arkansas*, 435 U.S. 475, 488-89 (1978).  However, absent a timely objection, a conflict of interest claim

premised on multiple representation of co-defendants[3] requires a showing that an actual conflict adversely affected counsel's representation of a particular defendant before the prejudice component will be presumed. *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980).

### 2.      Waiver

Respondent opposes Petitioner's claim, asserting Petitioner waived his right to conflict-free counsel. Courts have long recognized a criminal defendant's right to waive his constitutional rights. *E.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 463-64 (1938); *United States v. Garcia*, 517 F.2d 272, 275-78 (5th Cir. 1975), *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259, 262-63 & n. 2 (1984).  As the Supreme Court has explained:

> A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of [the] right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

*Zerbst*, 304 U.S. at 464.  Such waivers must be voluntary as well as "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *see also Garcia*, 517 F.2d at 276-77.

To uphold a defendant's waiver, such waiver must be established by "clear, unequivocal, and unambiguous language." *United States v. Rodriguez*, 982 F.2d 474, 477 (11th Cir. 1993).  In order for a waiver of the right to conflict-free counsel to be considered knowing and intelligent, the record must show that the defendant: "(1) was aware that a conflict of interest existed; (2) realized the

---

[3]      It is unresolved in the Eleventh Circuit whether the *Sullivan* standard applies outside of the multiple representation context to other conflicts of interest. *See, e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1324-28 (11th Cir. 2006); *Quince v. Crosby*, 360 F.3d 1259, 1263 & n. 4 (11th Cir. 2004).

consequences to his defense that continuing with counsel under the onus of a conflict could have; and (3) was aware of his right to obtain other counsel." *United States v. Garcia*, 447 F.3d 1327, 1337 (11th Cir. 2006) (quoting *Zuck v. Alabama*, 588 F.2d 436, 440 (5th Cir. 1979)).  When a defendant "effectively waived any conflict following a thorough pretrial hearing,"[4] the district court is not required to inquire at trial about defense counsel's conflict of interest.  *Id.*  A determination that a defendant has waived his right to conflict-free counsel disposes of the need to evaluate the actual or potential ineffectiveness of counsel caused by the alleged conflict(s) of interest. *Rodriguez*, 982 F.2d at 477.

## B.    Merits

Petitioner's first three claims for relief are based on the claim that his trial counsel, F. Lee Bailey, rendered ineffective assistance of counsel.  (Doc. No. 1 at pp. 6-7.)  Petitioner asserts two sources for Mr. Bailey's conflict of interest.  First, Petitioner claims that Mr. Bailey conspired with Petitioner to commit the crimes for which Petitioner was charged, thus rendering ineffective assistance of counsel.  (Doc. No. 1-2 at pp. 1-2, ¶¶ 3-4.)  Second, Petitioner claims that Mr. Bailey's pecuniary interest in a two million dollar Legal Trust Fund established in the Cayman Islands for the defense costs of the McCorkles' trial prevented Mr. Bailey from engaging in plea discussions with the federal prosecutors.  (*Id.* at p. 2, ¶ 3.)  In reply, Respondent argues that Petitioner waived these conflicts in the pre-trial *Garcia* hearing before Magistrate Judge Glazebrook.  (Doc. No. 18

---

[4]    Hearings intended to evaluate a defense counsel's conflicts of interest with a criminal defendant and to determine whether the defendant waives these conflicts are often referred to as "*Garcia* hearings" after the Fifth Circuit Court of Appeals case *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).  In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit that were handed down prior to October 1, 1981.

at pp. 11-16.)  Petitioner denies that he knew the exact nature of Mr. Bailey's conflicts and further

argues that these conflicts are unwaivable.  (Doc. No. 27.)

### 1.	Knowledge of Conflicts

The record reveals that Petitioner was aware of Mr. Bailey's conflicts of interest prior to the

*Garcia* hearing held on March 23, 1998.  In his Verified Sworn Statement, Petitioner asserts:

> During the March 23, 1998, (sic) *Garcia* hearing, the Court did not explain to me
> that Bailey's involvement with me during the preceding 18-plus months in regard to
> promoting business for Cash Flow Systems, Inc., by advising me to create National
> Media, Inc., and by advising me to open the "Nassofer account," for which I was
> charged with money laundering activities following the May 1997 search and seizure
> in the case, might be activities that could cause a lapse in Bailey's representation
> during pre-trial stages of the case.

(Doc. No. 1-2 at p. 2.)  Petitioner further alleges he knew that Mr. Bailey paid $100,000 to

Petitioner's American Express Card account to enable Petitioner to continue to do business.  (*Id.* at

p. 3.)  Finally, Petitioner was aware of the Cayman Island Legal Trust Fund prior to trial.  (*Id.* at p.

2.)  Thus, Petitioner does not deny his *knowledge* of the facts creating Mr. Bailey's conflicts of

interest.  Instead, he denies understanding the potential *consequences* of these conflicts.  However,

Magistrate Judge Glazebrook thoroughly evaluated with Petitioner the possible consequences of Mr.

Bailey's continued representation of him in the pre-trial *Garcia* hearing.

### 2.	Pre-Trial *Garcia* Hearing

#### a.	Matters Discussed

On March 23, 1998, Magistrate Judge Glazebrook conducted an extensive pre-trial *Garcia*

hearing to determine whether Mr. Bailey had conflicts of interest that would affect his representation

of Petitioner.  (Crim. Doc. No. 123.)[5]  Judge Glazebook began his inquiry by explaining that he was

concerned with a "[c]onflict of interest from prior representation of co-defendant in a related case,"

"whether there's any related issue in (sic) the lawyer as a witness," and "whether there's any conflict

of interest through prohibited transactions."  (*Id.* at p. 45.)

During the hearing, Judge Glazebrook discussed Mr. Bailey's involvement in Petitioner's

business and the possible effects of this prior involvement on Mr. Bailey's representation of

Petitioner.  (*Id.* at pp. 45-88.)  Assistant United States Attorney ("AUSA") Paul Byron expressed

concern that Mr. Bailey's previous involvement with the McCorkles' business affairs would make

him a *de facto* witness at trial.  (*Id.* at pp. 71-79.)  That is, Mr. Bailey's own conduct might become

a feature at trial.  AUSA Byron specifically discussed how Mr. Bailey's conduct might be called into

question during the trial and also how Mr. Bailey's credibility could not be fully addressed with Mr.

Bailey acting as an attorney rather than a witness.  (*Id.* at pp. 71-81.)

Judge Glazebrook expressed concern about this prospect in part because Petitioner would

be unable to present any type of good faith defense at trial.  Judge Glazebrook explained:

> But there's a well known defense and a jury instruction on good faith reliance on
> counsel and I would expect Mr. McCorkle and Mrs. McCorkle may consider that
> defense.  There's another defense called good faith belief and a jury instruction on
> that.  I cited it in a notice of hearing just so everybody would be prepared on it,
> where the defense is I had a good faith belief that this infomercial was not fraudulent
> and the whole thing the government says is a scheme is legitimate.  And is the
> government saying that something about Mr. Bailey's participation would refute that
> if he was called as a witness for the government because he knows it wasn't really
> in good faith?  And then on the other side, are either Mr. McCorkle or Mrs.
> McCorkle going to ever want to call Mr. Bailey as a witness saying, look, I relied on

---

[5]    The indictment was returned against Petitioner on March 5, 1998.  (Crim. Doc. No.
1.)  Petitioner's initial appearance before Judge Glazebrook was on March 10, 1998.
(Crim. Doc. No. 43.)  The *Garcia* hearing was conducted less than two weeks later
on March 23, 1998.  (Crim. Doc. No. 123.)

him in good faith and I went to the best lawyer I could think of, F. Lee Bailey, and I told him about my infomercials and he said they weren't fraudulent, they were fine and I could continue, you know, promulgating them and taking in money.  And he recommended that I put it offshore in the Caymans and this was all legal advice, not business advice.

(*Id.* at pp. 70-71.)   Judge Glazebrook and AUSA Byron subsequently discussed this potential

problem at length:

AUSA BYRON: Part of the problem that I see is this: By being involved so heavily in the negotiation phase with the Attorney General's Office [during a prior state investigation], forgetting his direct role as a witness in the admission by his client, forgetting that, putting that aside as just one grounds (sic), this now being another one, the defendant has to at some point make a choice.  And the choice may be I'm going to give up this special jury instruction number 16 of good faith defense, I'm going to give that up because I cannot have my lawyer, Mr. Bailey, cross-examining witnesses saying didn't I tell you or didn't you tell me the following because he is directly putting his own credibility in issue, which is not allowed by the rules.

* * *

THE COURT: Are you saying that Mr. McCorkle at least or maybe Mrs. McCorkle as well would have to give up good faith reliance on counsel defense and the good faith belief defense in order for Mr. Bailey to represent Mr. McCorkle at trial?

AUSA BYRON: I think it severely limits those defenses and my thought on that is this: If an advocate is prohibited from placing his or her credibility in issue during cross examination or direct examination, which we clearly know that is the way it is, lawyers cannot be an advocate and conduct the cross examination.  They can ask questions, they can't give testimony.

(*Id.* at pp. 75, 79-80.)  To be sure that Petitioner was listening to all of this, Judge Glazebrook stated:

And Mr. and Mrs. McCorkle and Mr. Higgins, Mr. Smith, Mr. Venske, I do want you to pay attention of course throughout this.  I know you are paying attention, but I'm not going to go over each little thing that's said, but I am going to afterwards ask you whether you have understood what the prosecutor's concerns were and what we are discussing and whether you want to hire conflict-free counsel.  So that's why I just want you to keep paying attention to all of this, even though it may seem a little dry.

(*Id.* at 67.)  The Court then proceeded to ask Mr. Bailey about this conflict:

MR. BAILEY: However, I am quick to say that there is no contemplated defense of good faith reliance on legal advice, Your Honor. That pertains to a case where you come to me for advice and I give you advice and I'm off and you act upon it. Now if I said you could kill your mother, you're not entitled to act upon it. But if I say you don't owe any taxes and I'm a tax expert and I'm wrong, you may have a defense. That's not being raised here.

THE COURT: So they're not going to say anything like, well, I went to Lee Bailey and he said that there was no, that I wasn't furthering the fraud by transferring assets overseas and therefore the government's allegation that this is all shady is wrong. They're not going to do that.

\* \* \*

THE COURT: So Mr. McCorkle is not going to rely on good faith reliance on counsel and not seek that instruction and not make that argument, even with respect to the funds or anything else?

MR. BAILEY: No, Your Honor. We have no trial plan that would fit that kind of defense.

(*Id.* at pp. 94-95.)   As this demonstrates, Petitioner heard a discussion of how one of the consequences of Mr. Bailey's continued representation would be giving up a good faith defense at trial.

Aside from Mr. Bailey's conflict with a good faith defense, Judge Glazebrook raised the general issue of the possible criminality of Mr. Bailey's conduct. Judge Glazebrook specifically asked AUSA Byron: "The government doesn't take the position that there's any *McLain* issue, is there?" (*Id.* at p. 81.) AUSA Byron responded: "No." (*Id.*) Judge Glazebrook continued, "I guess my follow-up question is does the government make any argument that Mr. Bailey in any way was involved in materially furthering a course of fraudulent conduct?" (*Id.* at pp. 81-82.) AUSA Byron replied:

The way that question is phrased, Your Honor, puts a criminal spin to Mr. Bailey's involvement. I think that what the evidence showed at the hearing we had and the lack of results from the people who were retained to ostensibly take certain

corrective measures, I think it shows that, and Judge Baker so found, that these people who were brought in place really were there just to give the Attorney General's Office some sense that progress was being made, when in fact nothing substantial was taking place.  Whether that rises to the level of obstruction is a fact specific issue.

(*Id.* at p. 82.)  Accordingly, Judge Glazebrook read from the rules of professional conduct and stated,

"[The Rule] says, first, the lawyer may not counsel or assist the client in . . . conduct that is criminal

or fraudulent, and I see there's no allegation of that here.  I just have an obligation to explore this."

(*Id.* at p. 83.)  AUSA Byron later affirmed: "I wouldn't take it so far as to say that Mr. Bailey knew

it was fraudulent or was furthering it . . . ."  (*Id.* at p. 86.)  Nevertheless, Judge Glazebrook read

aloud the ethical rules regarding an attorney's knowledge of and participation in a client's criminal

activity:

> Second, the lawyer, it says a lawyer may have been innocently involved in past conduct by the client that was fraudulent.  In such a situation the lawyer has not violated the rule because to, quote, counselor assist (sic) fraudulent conduct requires knowing that the conduct is of that character.
> Third, the lawyer may learn that a client intends prospective conduct and that is criminal as stated in subdivision B1, the lawyer shall reveal information in order to prevent such consequences.  It is admittedly difficult for a lawyer to know when the criminal intent will actually be carried out for the client may have a change of mind.
> And under withdrawal it says if the lawyer's services will be used by the client in materially furthering a course of criminal or fraudulent conduct, the lawyer must withdraw.  And where a legal claim or disciplinary charge alleges complicity of the lawyer in a client's conduct or other misconduct–and I'm not saying that that in any way is here, I'm trying to find out what the government's position is–the lawyer may respond.

(*Id.* at pp. 83-84.)  The Court then addressed the specific conduct at issue with AUSA Byron:

THE COURT: Do you claim that Mr. Bailey had any role in the transfer of assets overseas?

AUSA BYRON: He know (sic) that he advised his clients to open the accounts in the Cayman Islands because–

MR. BAILEY: That's absolutely false.  It was opened in 1992.

AUSA BYRON: I stand corrected.  It was not open.

THE COURT: Thank you for being patient, Mr. Bailey.  I do want to hear from you completely when–

AUSA BYRON: I stand corrected.  I didn't mean–I spoke poorly when I said it was opened.  The account was opened in 1992.  It remained inactive.  There was a series of years that went by, but after Mr. Bailey got involved I know that through his comments to [government agent] Lisa Young that he advised his clients to move the money offshore because of more favorable banking conditions.  The significance of that–

THE COURT: Can you–are you getting that from an Attorney General's person who spoke with Mr. Bailey?

AUSA BYRON: That's correct.

THE COURT: And she said that he advised them to move them overseas because of favorable banking conditions?

AUSA BYRON: More favorable banking conditions.  Daniel Skouras speaks about that also, the former employee, because he thought the interest rate of return was fairly meager in the Caymans and he could do better with the money than having it in the Caymans.

(*Id.* at pp. 87-88.)  The Court then questioned Mr. Bailey:

THE COURT: Now, let me ask you something hypothetically to help me understand this.  Let's talk about a different case.  Assume you have a different defendant who is charged with, with a crime.  If you actually have knowledge of your client's intent to do something, does that make you a witness or isn't that true in most criminal cases after you talk to your client?

MR. BAILEY: Well, you're being very hypothetical because there will be no evidence from any source inside the defense case that I could possibly anticipate that Mr. McCorkle was pursuing things fraudulently, with or without my knowledge (INAUDIBLE).  He was seeking a course that would keep his company operating.
    But to respond to your question directly and citing a case called *Bailey v. United States* decided by Judge Lee in 1975, when there is a ruling that there has been fraudulent use of the attorney-client privilege, whether the attorney knows it or not, then the privilege is (INAUDIBLE), and it is possible that the attorney can be called as a witness to say I told my client not to do that, it was fraudulent, and he did

> it anyway.  The government has no such representation to make in this case as they
> did in that one, even though it didn't turn out to be true.

(*Id.* at pp. 97-98.)  This shows that Petitioner was alerted to the fact that Mr. Bailey's conduct could

possibly be viewed as wrongful and might affect his representation of Petitioner at trial.

Aside from Mr. Bailey's past involvement in Petitioner's business activities, Judge

Glazebrook recognized that Mr. Bailey had a financial interest in the Cayman Islands Legal Trust

Fund.  In particular, Judge Glazebrook noticed that Mr. Bailey was listed as a claimant in a pending

civil forfeiture case against the McCorkles.  (*Id.* at p. 54.)  When asked about this, Mr. Bailey

responded: "[I told Mr. McCorkle to] segregate a fund for his defense, but not to move it anywhere

and put it under the supervision of attorney Charles Quinn in the Caymans." (*Id.* at p. 56.)  Though

this account was only in Mr. Quinn's name, Judge Glazebrook further inquired, "But is it yours or,

I mean do you claim it's yours or why are you a claimant in this case?"  (*Id.*)  Mr. Bailey replied:

> Because I had assured other counsel as they were brought into this case that I would
> be responsible to the extent that I possibly could for payment of their fees, having
> been in the case earlier, particularly Mr. Horwitz and Mr. Fussell.  And that fund was
> set up on May 12 when there was no restraint whatsoever against them for that
> purpose and for the purpose of defending the case in the Caymans.

(*Id.* at p. 57.)  The discussion continued:

> THE COURT: So that $2 million is not just for your defense, it's for Mr. Horowitz's
> firm and Mr. Egan.
>
> MR. BAILEY: It is a defense fund, Your Honor, and there's no $2 million that's up
> there now.  It's substantially less than that. . . .  I do not know the balance of that fund
> as we speak.

(*Id.* at p. 58.)  Judge Glazebrook thereafter concluded: "So you claim, you're a claimant in this case

because you claim that money should not go to the United States as they claim, but rather should

be available for the defense of Mr. McCorkle and Mrs. McCorkle and the ten corporations, is that

right?" (*Id.*)  Mr. Bailey answered in the affirmative.  (*Id.*)  This discussion shows that Petitioner heard that the Cayman Islands Legal Fund could be a potential source of conflict between himself and his counsel.[6]

As the foregoing record demonstrates, Judge Glazebrook covered all the areas of conduct that Petitioner now cites as unknown sources of Mr. Bailey's conflicts.  Even if Petitioner had no personal knowledge of this conduct, Petitioner was made aware of it during the March 23, 1998 hearing which he attended.  He also heard the possible consequences of these potential conflicts on his defense at trial and therefore cannot now claim complete ignorance of Mr. Bailey's conflicts of interest.

### b.     Explanation of Sixth Amendment Rights

Furthermore, Judge Glazebrook fully explained to Petitioner his Sixth Amendment right to effective, conflict-free counsel.  During the *Garcia* hearing, Judge Glazebrook told Petitioner directly that "you need to have conflict free counsel to avoid ineffective assistance of counsel because sometimes conflicts can produce in an attorney a level of ineffectiveness." (*Id.* at p. 105.) Judge Glazebrook elaborated by explaining to Petitioner that this was not a matter of skill or experience, but the problem was that "if [your attorney] has divided loyalties [he] might not be able to strongly represent your interests if [he is] distracted by some other interest." (*Id.*)  The Judge

---

[6]      To the extent Petitioner argues that Mr. Bailey's interest in the Cayman Islands Legal Fund made him unwilling to engage in plea negotiations, Petitioner was aware of this unwillingness prior to the *Garcia* hearing.  In Petitioner's Verified Sworn Statement, Petitioner states that he expressly asked Mr. Bailey to pursue plea negotiations prior to trial, and "Bailey became angry and said, 'I don't do deals.'  I said, 'I want you to call the prosecutor and ask what we can get.'  Bailey refused and hung up on me.  He told me, 'Get a new lawyer if you want to plead guilty.'" (Doc. No. 1-2 at p. 5, ¶¶ 16-17.)

warned Petitioner that "we can't predict exactly what's going to happen in the trial on down the road

and so we have to assess as best we can what's likely to happen . . . ." (*Id.* at pp. 46-47.)  Judge

Glazebrook then stated:

> Now, I want to address each of you personally, Mr. and Mrs. McCorkle, and tell you
> a little bit about the potential dangers of ineffective assistance of counsel and hear
> whether or not you want to waive that right.  If you do waive the right at the end of
> the hearing, you'll never be able to raise ineffective assistance of counsel regarding
> any conflict of interest in this court and the district court by collateral attack, by
> habeas corpus petition, Rule 2255 motion or in the court of appeals, so it's a
> complete waiver.  And that's why I want to make sure you're doing this freely and
> voluntarily if you want to do that.

(*Id.* at pp. 105-06.)

Thus, during the *Garcia* hearing, Petitioner was informed of his Sixth Amendment right to

effective, conflict-free counsel.  He was present for over an hour of discussion regarding Mr.

Bailey's possible conflicts of interest and the likely consequences of these conflicts on his defense

at trial.   Furthermore, Petitioner himself had personal knowledge of Mr. Bailey's conduct.

Therefore, when Judge Glazebrook entered into the waiver colloquy with Petitioner, Petioner was

fully informed of his rights, Mr. Bailey's conflicts of interest, and the resulting consequences of Mr.

Bailey's continued representation of Petitioner.

### c.      Waiver

At the end of Judge Glazebrook's dialogue with the attorneys, he said to Petitioner: "Now,

you've heard about an hour and a half of discussion about potential conflicts of interest that could

arise.  Mr. McCorkle, were you able to hear and understand everything that counsel have said with

me?" (*Id.* at p. 106.)  Petitioner responded, "Yes, sir." (*Id.*)  Judge Glazebrook then asked, "Do you

understand that if any of these concerns gave rise to an actual conflict or a potential conflict, that

there would be serious dangers in the lawyers representing you?  Mr. McCorkle for Mr. Bailey?"

(*Id.* at pp. 106-07.)  Petitioner replied, "Yes, sir."  (*Id.* at p. 107.)  The Court continued: "Do either of you have any questions for me about the potential dangers of a conflict of interest?  Mr. McCorkle?"  (*Id.* at p. 108.)  Petitioner responded, "No, Your Honor."  (*Id.*)

Next, Judge Glazebrook asked Petitioner, "Are there any potential conflicts at all that you would like to have an evaluation with a separate counsel?  Because you can talk to any lawyer at all at this point now before you make the decision."  (*Id.* at pp. 109-10.)  Petitioner responded, "Thank you, Your Honor.  No."  (*Id.* at p. 110.)  Finally, the Court asked, "Do . . . you clearly, unambiguously, unequivocally wish to waive your Sixth Amendment protections and your Fifth and Fourteenth Amendment protections to have 100 percent conflict free counsel? Mr. McCorkle?"  (*Id.* at p. 111.)  Petitioner responded, "Yes, Your Honor."  (*Id.*)  The Court asked: "Are you doing that freely and voluntarily because you want to make that waiver or is there some other reason?"  (*Id.* at p. 112.)  Petitioner stated: "Freely, Your Honor."  (*Id.*)  The Court then stated:

> I find that Mr. and Mrs. McCorkle have freely and voluntarily, clearly, unambiguously and unequivocally waived their rights, waived their Sixth Amendment rights with respect to all issues discussed today, specifically they've waived their right to ever raise ineffective assistance of counsel arising out of the conflict of interest in the district court on collateral attack through habeas petitions and on appeal.

(*Id.*)  Thus, the record shows that Petitioner waived his right to conflict-free trial counsel.

### 3.    Validity of Petitioner's Waiver

In its argument that Petitioner's waiver of conflict-free counsel was valid, Respondent directs this Court to the *Cruz* case, an unpublished Eleventh Circuit opinion in which the Court found a valid waiver of a personal conflict of interest between the defendant and her counsel.  *Cruz v. United States*, 188 F. App'x 908, 911-12 (11th Cir. 2006).  In *Cruz*, at the time of her *Garcia* hearing, the defendant was aware of her counsel's "desire to keep information about his personal behavior quiet"

and that this was "affecting his legal advice." *Id.* at 912.  Though the Court recognized that "the *Garcia* hearing was not framed to deal with the specific conflict at issue here," the Court nevertheless found "the court did inform [defendant] during the hearing that she had the right to effective assistance of counsel and to an independent lawyer." *Id.*  Thus, the Court concluded, "the record supports the district court's finding that [defendant] also waived the right to have an attorney free from the conflicts carried by [her attorney's] personal behavior."  *Id.*  The *Cruz* case demonstrates that a defendant may waive conflicts of which he or she had knowledge at a *Garcia* hearing even if the court does not address those conflicts specifically or expressly determine that specific conduct creates a conflict.

Petitioner cites *United States v. McLain*[7] as controlling authority in this case.  (Doc. No. 4 at p. 13.)  In *McLain*, unbeknownst to the trial court or the defendant, defense counsel was under criminal investigation by the same United States Attorney's office that was trying the defendant. *McLain*, 823 F.2d at 1463.  The *McLain* Court found ineffective assistance of counsel but also stated that the defendant could have waived the conflict if he had known about it prior to trial.  *Id.* at 1464 & n. 11.

The *McLain* case is distinguishable from the instant case.  Though Mr. Bailey was at one point under investigation by the United States Attorney's office, such investigation did not commence until after the trial and sentencing of Petitioner.  (Crim. Doc. No. 1175 at p. 108.)  In a hearing on July 29, 1999, Assistant United States Attorney Rick Jancha explained that the investigation of Mr. Bailey began on May 19, 1999. (*Id.*)  Judge Glazebrook was informed of the

---

[7]     *United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987), *overruled on other grounds as recognized in United States v. Watson*, 866 F.2d 381, 385 n. 3 (11th Cir. 1989).

investigation that same day and held a hearing on May 25, 1999 to discuss the matter with Mr. Bailey and Petitioner.  (*Id.*; *see also* Crim. Doc. No. 1185.)  During the hearing, Mr. Bailey expressed his surprise at this "shocking development." (Crim. Doc. No. 1185 at p. 7.)  Thereafter, Judge Glazebrook held additional hearings regarding the conflict in July of 1999 and appointed an independent counsel, Robert A. Leventhal, to advise Petitioner on the matter.  (Crim. Doc. No. 1156.)  Petitioner indicates that immediately after these hearings, he hired another attorney to represent him, William M. Kent.  (Doc. No. 1-2 at p. 6.)  Thus, Mr. Bailey was not representing Petitioner while he was under investigation, and *McLain* does not apply.

The facts in the instant case are similar to those in *Cruz*.  Petitioner knew the nature of Mr. Bailey's involvement in his business activities and also knew about the Cayman Island Legal Trust Fund.  Petitioner was clearly informed of his right to conflict-free counsel prior to trial, less than two weeks after his arraignment.  He was given an opportunity to speak with an independent attorney and to ask the Court any questions about potential conflicts or any of the subjects raised during the hearing.  (Crim. Doc. No. 123 at pp. 105-12.)

During the *Garcia* hearing, the Court clearly explained the consequences of Petitioner's waiver to Petitioner.  (*Id.* at p. 106.)[8]  Petitioner cannot now claim that this waiver is invalid when, at the time of the waiver, he knew of the conduct giving rise to the purported conflict of interest of which he now complains, as well as the likely consequences of that conflict.  The fact that Judge Glazebrook did not expressly address the particular conflict does not make Petitioner's waiver any less voluntary, knowing, or intelligent.  *See Cruz*, 188 F. App'x at 911-12.  The Court finds that the

---

[8]        The text of Judge Glazebrook's explanation is reproduced in Section II.B.2.b, *supra*.

record clearly, unambiguously, and unequivocally shows that Petitioner voluntarily, knowingly, and intelligently waived his right to a conflict-free trial counsel.

### 4. *Per Se* Rule

Petitioner urges this Court to in effect invalidate his waiver by recognizing a *per se* ineffectiveness of counsel rule.  (Doc. No. 1 at p. 6; Doc. No. 4 at pp. 13-16.)  Some courts have found that certain conflicts create *per se* ineffective assistance and are therefore not waivable by a defendant.  *E.g.*, *United States v. Fulton*, 5 F.3d 605, 611-12 (2d Cir. 1993) (citing *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984)).  Most notably, the Second Circuit Court of Appeals has found *per se* ineffective assistance where there is a "reasonable possibility" that an attorney engaged in criminal activity, and the court finds such activity is "sufficiently related" to the defendant's charged crimes that "the attorney's vigorous defense of his client will be compromised." *Id.*  If this is the case, the Second Circuit held that there can be no valid waiver of conflict.  *Id.* at 614.  The Seventh Circuit Court of Appeals, however, rejected this rule, because "it would require us to accept the 'disingenuous and incongruous' argument that the defendant received ineffective assistance on the basis of a conflict that the defendant was well aware of long before trial."  *United States v. Wallace*, 276 F.3d 360, 368 (7th Cir. 2002) (quoting *Cerro v. United States*, 872 F.2d 780, 785 (7th Cir. 1989)).[9]  Further, the Tenth Circuit Court of Appeals has suggested that the viability of the

---

[9]     The Second Circuit introduced its *per se* rule regarding a defense counsel's alleged criminal involvement in a case where the defendant had no knowledge of his counsel's activities.  *Cancilla*, 725 F.2d at 870.  Thus, it is not clear that the *per se* rule applies even in the Second Circuit when the defendant was aware of counsel's allegedly criminal activity prior to trial.

Second Circuit's *per se* rule is called into question by the Supreme Court's holding in *Mickens v. Taylor*.[10]   *Mora v. Williams*, 111 F. App'x 537, 547 n. 4 (10th Cir. 2004).

The Eleventh Circuit has not explicitly accepted or rejected the Second Circuit's *per se* rule. *Pegg v. United States*, 253 F.3d 1274, 1279 (11th Cir. 2001).  However, in *Frazier v. Secretary for the Department of Corrections*, the Eleventh Circuit held that presumed ineffectiveness would only be found in the four scenarios outlined by the Supreme Court in *Cronic*.  *Frazier*, 197 F. App'x 868, 871-72 (11th Cir. 2006) (quoting *Cronic*, 466 U.S. at 659-61) (describing these four scenarios as complete denial of counsel, denial of counsel during a critical stage of the proceedings, counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, and where circumstances are so prejudiced against the defendant that competent counsel could not render effective assistance). This presumption only applies to a "very narrow spectrum of cases" where the circumstances "are so egregious that the defendant was in effect denied any meaningful assistance at all."  *Id.* at 872 (quoting *Chadwick v. Green*, 740 F.2d 897, 901 (11th Cir. 1984)).

The Court finds the reasoning of the Seventh Circuit persuasive in rejecting a *per se* ineffectiveness rule in this context, as the Seventh Circuit's decision is consistent with the Eleventh Circuit's holding in *Frazier* and the Supreme Court's holding in *Cronic*.  Accordingly, a defendant who is aware of his attorney's allegedly criminal activities prior to trial may not rely on a *per se* ineffectiveness rule to overcome waiver of his right to conflict-free counsel.  Finding otherwise would give a defendant the perverse incentive to abuse the attorney-client privilege and hide

---

[10]     *Mickens v. Taylor*, 535 U.S. 162, 174 (2002) (suggesting that the *Sullivan* presumptive prejudice standard for ineffective assistance of counsel based on an attorney's conflict of interest may not apply outside the multiple representation context).

knowledge of his counsel's allegedly criminal activities prior to trial so that he could later claim a constitutional violation.  This would be, as the Seventh Circuit found, a "disingenuous and incongruous" interpretation of the Sixth Amendment right to effective assistance of counsel.  It would turn that right into a hidden trump card that the defendant could play to overturn a valid conviction.

Since Petitioner knowingly and intelligently validly waived his right to conflict-free trial counsel, Claims One, Two, and Three must be dismissed.

### III.    Claim Four

In his fourth claim for relief, Petitioner asserts "[p]rosecutorial misconduct violative of the Fifth Amendment right to a fair trial."  (Doc. No. 1 at p. 7.)  He states:

> During the McCorkle jury trial the Orlando US Attorney's Office, with AUSA DeMarco, initiated an investigation into F. Lee Bailey's suspected involvement in the crimes for which Bailey was representing McCorkle at trial.  At all times relevant to this error, AUSA DeMarco, et als, (sic) failed to advise the Court of this potential conflict of interest thus violating McCorkle's right to conflict free counsel and a fair trial.  The existence of the investigation is documented.

(*Id.*)

This claim fails because the record affirmatively contradicts Petitioner's allegation.  The investigation into Mr. Bailey's conduct began on May 19, 1999, after the trial and sentencing of Petitioner.  (Crim. Doc. No. 1175 at p. 108.)  Accordingly, there was no investigation of Mr. Bailey "[d]uring the McCorkle jury trial," and the United States Attorneys committed no error in failing to advise the Court of an investigation that did not yet exist.  Furthermore, this claim is procedurally barred as Petitioner did not raise it on direct appeal and has not offered any reason for this failure.[11]

---

[11]    Petitioner does not appear to recognize that this claim is defaulted, nor does he allege
(continued...)

*Massaro v. United States*, 538 U.S. 500, 504 (2003) (describing the "general rule that claims not raised on direct appeal may not be raised on collateral review unless the petition shows cause and prejudice").  Therefore, Claim Four is dismissed.

### IV.    Claims Five, Six, and Seven

Petitioner's fifth, sixth, and seventh claims for relief involve the alleged ineffective assistance of his appellate counsel.  He asserts that H. Manuel Hernandez, Don R. West, and William M. Kent provided ineffective assistance for failure to raise the claim on direct appeal that "during the first two *Garcia* hearings regarding F. Lee Bailey's conflict of interest with McCorkle, the District Court . . . violated McCorkle's Fifth Amendment right to a fair trial by failing to conduct an adequate *Garcia* inquiry as required by governing law."  (Doc. No. 1 at pp. 7-9.)

Ineffective assistance of appellate counsel claims are analyzed under the *Strickland* standard.  *Smith v. Robbins*, 528 U.S. 259, 285-89 (2000).   A defendant must show that: (1) counsel's performance was deficient and "fell below an objective standard of reasonableness;" and (2) that the deficient performance prejudiced the defense.   *Strickland*, 466 U.S. at 687-88.   However, the Eleventh Circuit has explained that "it is axiomatic that the failure to raise nonmeritorious issues [on appeal] does not constitute ineffective assistance."  *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994); *see also Upshaw v. Mitchem*, No. 2:04-cv-1125-WKW, 2007 WL 1992083, at *13 (M.D. Ala. July 5, 2007) (collecting cases) ("Appellate counsel cannot be deemed ineffective for failing to raise meritless claims on appeal.").   Therefore, the Court must consider whether Petitioner's claim that the Court denied him due process by failing to conduct adequate *Garcia* hearings has merit.

---

[11](...continued)
         ineffective assistance of appellate counsel as cause for the default.

The United States Supreme Court has clarified the scope of the Due Process Clause in the context of criminal proceedings.  In *Medina v. California*, the Court explained, "In the field of criminal law, we 'have defined the category of infractions that violate fundamental fairness very narrowly' based on the recognition that, '[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'"  *Medina*, 505 U.S. 437, 443 (1992) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  The Court continued:

> The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order.

*Id.*  Therefore, courts should only find a violation of due process if a criminal proceeding "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.* at 445 (quoting *Patterson v. New York*, 432 U.S. 197, 201-02 (1977)).

Petitioner received an extensive *Garcia* hearing prior to trial to determine the extent of Mr. Bailey's conflicts of interest.  (Crim. Doc. No. 123.)  Judge Glazebrook took great pains to thoroughly explore possible conflicts and fully advised Petitioner of his rights.  (*See id.*)  Significantly, the Court gave Petitioner an opportunity to be heard, to seek independent counsel, and to ask the Court questions.  (*Id.* at pp. 105-12.)  This is hardly the type of proceeding that offends fundamental principles of justice.  Petitioner was given a fair hearing, and thus there was no due process violation during Petitioner's first *Garcia* hearing.

After trial, Judge Glazebrook held a second *Garcia* hearing to address Mr. Bailey's criminal investigation and appointed an independent counsel, Mr. Leventhal, to advise Petitioner about this post-trial conflict.  (Crim. Doc. No. 1156.)  The hearing was continued so that Petitioner could

consult with Mr. Leventhal.  (*Id.*)  After the hearing, Petitioner did in fact hire a new attorney to represent him during appeal.  (Doc. No. 1-2 at p. 6, ¶ 19; Crim. Doc. No. 740.)  Since the conflict caused by Mr. Bailey's criminal investigation arose after trial, it obviously did not affect the fundamental fairness of Petitioner's trial.  Furthermore, since Petitioner retained new counsel to represent him on appeal after this hearing and Mr. Bailey was no longer acting as his attorney, Petitioner cannot now argue that he was harmed by an insufficient hearing concerning Mr. Bailey's conflicts.  Thus, Petitioner was not denied due process of law.

Petitioner cannot use a baseless due process violation claim to resuscitate a failed ineffective assistance of counsel claim.  Given that Petitioner's underlying due process claim lacks merit, the Court cannot find that Petitioner's appellate attorneys were ineffective in failing to raise it.  *E.g.*, *Bolender*, 16 F.3d at 1573.  Therefore, the Court must dismiss Claims Five, Six, and Seven.

## V.      Claim Eight

Petitioner's last claim for relief involves the alleged denial of his due process right to a fair trial.  He asserts that the District Court violated his right to a fair trial by failing to conduct adequate *Garcia* hearings.  (Doc. No. 1 at pp. 9-10).

Petitioner did not raise this due process claim on direct appeal, and therefore it is procedurally barred, unless Petitioner shows cause and prejudice.  *Massaro*, 538 U.S. at 504.  The United States Supreme Court has explained: "Under this standard, to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains."  *Frady*, 456 U.S. at 167-68.  Here, Petitioner asserts ineffective

assistance of appellate counsel as the cause for not raising this claim on direct appeal.  (Doc. No. 1 at p. 10.)

In order to establish cause for procedural default due to ineffective assistance of counsel, a defendant must first prove an independently valid ineffective assistance of counsel claim.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  The Supreme Court has found: "In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim."  *Id.*  Absent such showing, the procedural default is not excused, and the defaulted claim should not be considered on collateral review.  *Id.*

As discussed in the previous Section, Petitioner has failed to establish that any of his appellate counsel were ineffective in their assistance.  Thus, Petitioner has not demonstrated cause, and the Court will not consider the merits of this claim.[12]  Therefore, the Court must dismiss Claim Eight.

## CONCLUSION

Based on the foregoing, the Court finds that Petitioner is not entitled to a hearing because his claims are either facially deficient or affirmatively contradicted by the record.  Any allegations not specifically addressed herein have been found to be without merit.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. The Motion to vacate, set aside, or correct an illegal sentence pursuant to 28 U.S.C. § 2255 filed by William J. McCorkle is **DENIED**, and this case is **DISMISSED** with prejudice. (Doc. No. 1.)

---

[12] Even if this claim was not procedurally defaulted, as the Court found in the previous Section, the claim is without merit.

2.      The Clerk of the Court shall enter judgment accordingly and close this case.

3.      The Clerk of the Court is directed to file a certified copy of this Order in Criminal

Case Number 6:98-cr-52-19GG and to terminate the Motion to vacate, set aside, or

correct an illegal sentence pursuant to 28 U.S.C. § 2255 pending in that case.  (Crim.

Doc. No. 1239.)

**DONE** and **ORDERED** in Chambers in Orlando, Florida on January 9 , 2008.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record
Unrepresented Party